Frank Jerome and Helen Jerome, et al. [1] v. Commissioner. Jerome v. Commissioner
Docket Nos. 2874-63 - 2876-63.
United States Tax Court
T.C. Memo 1965-316; 1965 Tax Ct. Memo LEXIS 13; 24 T.C.M. (CCH) 1763; T.C.M. (RIA) 65316; December 9, 1965
*13 Carl A. Stutsman, Jr., and Jack R. White, for the petitioners. Marion Malone, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the income tax of petitioners in the years and amounts as follows: Docket No.
Yea
Deficiency
2874-63
1958
$ 1,449.52
1959
46,005.19
2875-63
1959
42,705.51
2876-63
1959
42,335.27 By an amendment to his answer, respondent has asserted a claim for an increased deficiency in each docket as follows: Docket No.
Year
Deficiency
2874-63
1959
$87,957.14
2875-63
1959
86,538.40
2876-63
1959
86,346.32
All issues raised in the original notices of deficiency have been disposed of by agreement between the parties. The only issues remaining for decision are those raised by respondent's amended answers and by petitioners' replies thereto. The issues for decision are: (1) Did Veronica Compania Naviera, S.A., a Panamanian corporation, act as a nominee or conduit for the Jerome Brothers partnership in the sale of copra oil processing and extraction plant so that in substance the gain from said sale was properly attributable to *14 the Jerome Brothers partnership and was taxable to the individual petitioners as their distributive share of partnership earnings; and (2) if the answer to the first issue is in the affirmative, then, was the gain on said sale taxable to the individual petitioners as a capital gain or as an ordinary income? [2]
Findings of Fact Some of the facts have been stipulated and, as stipulated, are incorporated herein by this reference. Petitioners Frank Jerome and Helen Jerome filed joint Federal income tax returns with the district director of internal revenue at Los Angeles, California, for the years 1958 and 1959. Petitioners Varney V. Jerome and Iva Jerome filed a joint Federal income tax return with the district director of internal revenue at Los Angeles, California, for the year 1959. Petitioners Paul Jerome and Angelina Jerome filed a Federal joint income tax return with the district director of internal revenue at Los Angeles, California, for the year 1959. Frank, Paul, and Varney Jerome are brothers whose business interests are *15 held in a partnership called Jerome Brothers. Baker Commodities Corporation, also known as Baker Rendering Company (hereinafter referred to as Baker), is a California corporation organized in 1946. Its business location is 4020 and 4073 Bandini Boulevard, Los Angeles, California. All of its stock was owned by Frank, Paul and Varney Jerome from the date of incorporation through June 1961. Frank Jerome has always been the president and a director of Baker. James Andreoli was employed as a bookkeeper in 1951 and is presently the treasurer and a stockholder of the corporation. L. N. Nelson is presently the secretary of Baker. Louis Frederick has been employed as Baker's marketing manager from 1952 to the time of the trial herein. Baker's principal business is the rendering of meat by-products into animal foods and tallow. Before and during the years involved herein, the tallow was exported to Japan in tanker-type cargo vessels. In 1955 Frank Jerome became acquainted with a Los Angeles shipping broker named Max Linder, who handled some of Baker's tallow shipments. Linder suggested to Frank the possibility of organizing a corporation which would engage in the shipping business. This *16 type of exploit would insure to Baker the availability of cargo space and reduced freight rates. Because shipping was recognized as a risky business, Linder recommended that the proposed corporation initially charter vessels. It is customary for entrants in the shipping business to begin by chartering prior to purchasing their own vessels. Linder also suggested to Frank that a Panamanian corporation be formed to carry on the shipping business. The primary reasons for incorporation in Panama were (1) limitation of liability for the shipping business and (2) reduced shipping costs resulting from lower wage scales and fewer labor problems. In reliance upon Linder's recommendations Frank and his business associates decided to cause a Panamanian corporation to be organized for the purpose of getting into the shipping business and international trade. On or about August 26, 1956, a corporation named Veronica Compania Naviera (hereinafter referred to as Veronica) was organized under the laws of Panama, S.A. The organizational meeting for Veronica was held in New York City on August 29, 1956. Frank Jerome was elected president and director, Louis Frederick was elected vice-president, *17 James Andreoli was elected treasurer and director, and L. N. Nelson was elected secretary. The next meeting of the board of directors of Veronica occurred on October 1, 1956, and was held at the Baker offices at 4073 Bandini Boulevard, Los Angeles, California. At this meeting Frank resigned as president and director of Veronica, and James Andreoli resigned as a director (although he continued as treasurer). James Peacock and Jack Keith were elected to fill the respective vacancies. At this meeting it was resolved that one share of Veronica stock be issued to each of James Peacock, James Andreoli, and Jack Keith at a cost of $25 per share. It was reported at the meeting of October 1, 1956, that Baker had offered Veronica a charter on the Italian tanker known as the "Bulmar," and it was then authorized that the vice-president of Veronica execute a document entitled "Tanker Time Charter Party" on behalf of Veronica. A meeting of the board of directors of Veronica occurred on October 24, 1957, at 4073 Bandini Boulevard, Los Angeles, California. At this meeting the president reported that the company had chartered a Japanese vessel known as the "Juyo Maru" from Nippon Kayi Kyokai *18 for four months. The schedule of operation indicated that a cargo would be shipped from Los Angeles to Japan. At a meeting of the board of directors of Veronica held on December 10, 1958, in Los Angeles, California, it was reported that the corporation had chartered the vessel known as the "S.S. St. George" in early February 1959 for cargo transport between a Gulf port and the Far East. The records of Veronica indicate that it had a substantial amount of income and expenses from the chartering of these three vessels during the years ending June 30, 1958 and 1959. Veronica's records also indicate that it disbursed funds for miscellaneous expenses during the years 1957, 1958, and 1959. Veronica maintained bank accounts in the United States and did not have a bank account in Panama. In early 1959 Veronica established an office in Panama and employed a local representative. None of the officers or directors of Veronica received any salary, director's fees, or expense accounts from Veronica. Veronica's management hoped to purchase a cargo ship with the profits which Veronica derived from its chartering operations. Veronica was able to accumulate approximately $200,000 in earnings *19 from its chartering activities by early 1958, an insufficient amount for the purchase of a ship adequate to meet Veronica's requirements. Its management then realized the value in generating back-haul cargo on Veronica's trips to the Orient from the United States. With a long-haul commitment for cargo to and from the Orient, Veronica believed that it would be able to obtain financing for purchasing a ship. When Frank Jerome was in the Philippine Islands during early 1958, he recognized the feasibility of shipping copra as a liquid cargo instead of an bulk cargo, and he began to work on a deal involving the construction of a copra oil processing and extracting plant for use in the Philippines. The proposed copra plant was to produce a liquid oil which could be used as a return cargo on Veronica's vessels. It was then believed that the copra plant would cost approximately between $175,000 and $200,000. At such cost Veronica had sufficient funds to build the plant. Frank Jerome intended that Veronica would sell the copra plant in the Philippines and possibly that he would participate in its ownership. He was assured by Philippine attorneys that they had clients who wished to own such *20 a plant and that Veronica would have the privilege of handling the cargo it generated. On June 30, 1958, the Legaspi Oil Company (hereinafter referred to as Legaspi) was organized as a corporation under the laws of the Philippine Islands. Approximately 12 1/2 percent of the stock of Legaspi was and is held by Philippine nationals. Frank, Paul and Varney Jerome each own approximately 29.17 percent of the outstanding stock of Legaspi. Frank was primarily responsible for the establishment of Legaspi. Its purpose was to further the plan to generate copra oil as a liquid cargo from the Philippine Islands for Veronica's shipping activities. The hoped-for trading activities were expected to follow. The negotiations initiated by Frank on behalf of Veronica to sell the proposed copra oil processing plant and Legaspi began in early 1958. Frank was acting on behalf of Legaspi. He was also acting on behalf of Veronica insofar as Veronica's interests were concerned. At about the same time, Veronica began negotiating with Keith Engineering Company [3] (hereinafter referred to as Keith Engineering) to have a copra oil processing plant constructed for Veronica to purchase. *21 James Andreoli, as treasurer of Veronica, approached Jack Keith with regard to the Philippine project and they negotiated the terms of a contract for Keith Engineering to assemble and construct a copra oil processing plant for Veronica. Frank did not participate in the negotiation of this contract. Jack Keith knew at the outset that the ultimate user of the plant would be a Philippine corporation. During the negotiations, Jack Keith and James Andreoli discussed the magnitude of the proposed copra oil processing plant and estimated its cost. At the initial stage (in early 1958), Jack Keith estimated that the copra plant would cost Veronica in the area of $175,000 to $200,000. The terms which Keith Engineering agreed to with Veronica regarding the construction of the plant were cost plus 10 percent profit. [4] (Keith Engineering had made similar contracts with other customers and, at the time of trial herein, still does.) Keith Engineering began to perform under a verbal agreement with Veronica several months before said agreement was actually reduced to writing in August 1958. Keith Engineering *22 was not in a financial position to extend long-term credit to Veronica. Furthermore, since Keith Engineering was required to pay cash for the copra plant's component parts as they were purchased, it had to receive progress payments on a 30-day basis. After Keith had begun to perform, numerous difficulties and delays were encountered by the Philippine corporation in setting up its operation. Most of the difficulty was caused by Philippine authorities who repeatedly imposed restrictions and requirements on Legaspi's efforts to obtain a permit to operate the copra plant and sell its produce to Veronica. Because of such restrictions and requirements, the scope of the copra plant grew rapidly, adding its own power supply, boilers, etc., which improvements had not originally been antipated. This caused the cost of the plant to grow far beyond the initial estimate. (It also prevented Legaspi from commencing actual operations until 1961, even though the plant was delivered in 1959.) Legaspi entered into a contract with Veronica dated August 1, 1958. The contract was executed by Andreoli on behalf of Veronica. The terms of the contract provided, among other things, that Veronica would sell *23 a copra oil processing and extraction plant to Legaspi for a total price of $667,281. This agreement provided, among other things, that Veronica would ship the plant C.I.F., Legaspi City Harbor, Philippines. Furthermore, in order to secure payment of the aforesaid principal of the price, interest charges and C.I.F. charges, title to and ownership of the plant were to remain with, and be retained by, Veronica until full payment was effected by Legaspi to Veronica. It recited that Veronica had retained Keith Engineering to assemble and construcy the plant and install it in the Philippines. In view of the stringent foreign exchange controls which made immediate total payment impossible, payment was to be deferred. Veronica was given an exclusive marketing right to handle all of the products of Legaspi's plant. Legaspi was to pay for the plant by permitting Veronica to deduct and withhold 5 percent on the gross price of all export sales made by Legaspi, to be applied first to interest and then to principal on the price of the plant. The unpaid balance of the plant's purchase price drew interest at 5 percent to the date of full payment by Legaspi to Veronica for the plant, unless otherwise *24 amended. On or about August 5, 1958, a contract between Keith Engineering and Veronica, negotiated by Jack Keith and Andreoli, was executed in writing. Andreoli executed it on behalf of Veronica and Jack Keith executed it on behalf of Keith Engineering. Said contract recited, among other things, that Veronica had negotiated an agreement to provide a copra plant for a Philippine company and that Keith Engineering had previously been retained in the consulting and preliminary phases of the venture. The contract then provided that Keith Engineering would produce and sell the plant to Veronica for a price of cost plus 10 percent profit. (The contract noted that Veronica had already paid $40,000 for some of the equipment.) The agreement was restricted to equipment on a basis of F.A.S., Los Angeles Harbor, California. Any costs, stevedoring, shipping, C.I.F. charges, unloading or any costs of handling, erection, installation, or any costs beyond the United States shores were to be borne by Veronica and its assignee. Keith Engineering was also to provide services in connection with the erection of the plant in the Philippines. When the scope of the copra plant first grew and, consequently, *25 its cost to Veronica, it was believed by the parties concerned that Philippine investors would finance Veronica by means of loans. This belief still prevailed at the time the written agreements were signed in 1958. However, the Philippine investors backed out. Legaspi was unable to pay Veronica anything immediately. Jerome Brothers was the only source of funds to which Veronica could turn. Accordingly, Veronica was forced to borrow $547,780 to enable it to fulfill its commitment to Keith Engineering. The loans were made in late 1958 and 1959. On or about April 20, 1959, a supplemental agreement was entered into by Veronica and Legaspi. It recited certain changes and additions to the list of machinery and equipment covered by the original agreement and added the sum of $340,732 (the cost of such additions to and changes in the plant) to the price which Legaspi was to pay Veronica for the plant. [5]
The degree of risk involved was a material factor in determining the respective prices that Keith Engineering and Veronica were to receive. The fact that Keith Engineering was to *26 be paid in cash was taken into account in determining the price which Keith Engineering was to receive. By the same token, the fact that Veronica would have to extend long-term credit to Legaspi and thereby assume a considerable risk was instrumental in Veronica's receiving of a substantial mark-up over its cost. Veronica shipped the component parts of the plant on the vessel "S.S. St. George" from three different United States ports in April 1959. Keith Engineering presented its invoice dated April 30, 1959, for the copra oil processing and extraction plant to Veronica. The total billng shown was $757,548.75, including therein (1) cost of machinery and equipment in the amount of $571,447.08; (2) 10 percent profit as agreed in the amount of $57,144.70; and (3) freight, stevedoring, and insurance charges making up the balance. Payments were made to Keith Engineering covering its invoice to Veronica as follows: Date
Amount
July 22, 1958
$ 40,000.00
September 12, 1958
15,000.00
December 23, 1958
145,000.00
May 5, 1959
100,000.00
May 1959
457,548.75
$757,548.75
Because of the many difficulties Legaspi had with the Philippine authorities, it did not get *27 a permit to commence operating the copra plant until July 1961. At that time Legaspi commenced to operate the plant and sold all of its produce through Veronica in accordance with the contract until 1962. Veronica sold Legaspi's produce partly on its own, directly to customers, but mostly through the sales force of Baker. The office in Panama was opened by Veronica to handle the shipments from Legaspi. Legaspi's first payment to Veronica for the purchase of the copra plant occurred in December 1961. By the end of 1962 Legaspi had made payments totalling $322,000 to Veronica for the plant. Veronica's stock was sold to Baker in 1962 and Veronica was liquidated. Since then Baker has carried on the marketing contract with Legaspi. Partnership Federal income tax returns filed for the partnership Keith Engineering, covering all of the taxable periods involved herein, included as a portion of the gross receipts of said partnership the sum of $757,548.75 representing the selling price of the copra processing plant to Veronica and the profit on said sale of $57,144.70 [6] as a portion of its taxable profit. The partnership Federal income tax returns filed by the Jerome Brothers partnership *28 for each of the periods involved herein did not include as a portion of the taxable profit of said partnership any portion of the increase in the selling price of said copra plant on the sale of such plant by Veronica to Legaspi. Opinion The principal issue in this case is a question of fact. This issue is whether the sale of the copra oil processing and extracting plant to Legaspi was in reality made by Frank Jerome acting on behalf of Jerome Brothers or whether the sale was made independently by Veronica as the form of the transaction would indicate. Respondent contends that in substance the sale was made by the Jerome Brothers partnership consisting of United States taxpayers, using Veronica as a mere conduit or nominee, and therefore the gain on the sale should be reported by the partners of Jerome Brothers on their individual income tax returns. In other words, respondent argues that the transaction in issue actually involved a sale of the copra plant to Jerome Brothers who in turn sold it to Legaspi. Petitioners contend (1) that Veronica was a bona fide entity separate and apart from Jerome Brothers, with funds and a business purpose of its *29 own; (2) that Veronica entered into the transaction involved herein for legitimate business reasons; and (3) that at all times the parties dealt fairly with each other and at arm's length. Accordingly, they argue, there is no basis for respondent's contention that the facts were other than they purported to be. The burden of proof rests here on the respondent to establish not only the legal premises but also all the material facts necessary to support his claims. . We believe that respondent has failed to carry his burden. Initially, we note that there is nothing in the contracts or other documents to refute that Veronica was the actual vendor of the copra plant. The contract to purchase the plant from Keith Engineering by Veronica was negotiated by James Andreoli as Veronica's treasurer. The contracts to resell the plant to Legaspi were also executed by Andreoli for Veronica. The evidence is undisputed that Veronica performed all of its contracts precisely as they were written. Veronica actually paid Keith Engineering the full purchase price for the copra plant. In paying Keith Engineering for the copra plant, Veronica *30 used $200,000 of its earnings from ship chartering ventures. The balance of the purchase price which Veronica paid to Keith Engineering was supplied to Veronica via loans from the Jerome brothers. [7] However, the fact that a corporation obtains capital funds by means of loans from its shareholders does not destroy the integrity of its character or its activities. ; , affd. . To sustain his position that Jerome Brothers was the true seller of the copra plant to Legaspi, respondent relies mainly upon his showing (1) that all of the entities involved in the transaction in issue were owned, in whole or in part, by Jerome Brothers; (2) that Frank Jerome actively participated in all said entities' business affairs; and (3) that a sale by Veronica would have tax advantages. However, the fact that Jerome Brothers had stakes in the various entities involved, all of whose interests were interrelated, *31 certainly does not establish (1) that the acts of said entities were in reality the acts of Jerome Brothers in any capacity or (2) that they should be so treated for tax purposes. [8] Nor does a shareholder's retention of direction over his corporation's affairs destroy the independent tax status of that corporation. See ; Moreover, a real transaction may not be disregarded even if it is designed to procure an advantageous tax consequence. ; (C.A. 9, 1940), remanding . Upon careful scrutiny of the record before us, we are persuaded that Veronica was not a mere conduit in the sale of the copra plant. Veronica's management wanted to purchase its own cargo ship but could not afford one in 1958. At the same time, the feasibility of developing copra oil as a back-haul *32 cargo was being explored by Frank Jerome. Since Veronica had some money (approximately $200,000 which it had earned from chartering vessels) and was desirous of entering international trade, it was natural for Veronica to become a party to the copra plant transaction. [9] By securing a long-term contract for a backhaul liquid cargo from the Pacific, it would be able to finance the purchase of a ship. Veronica committed itself to buy a copra plant from Keith Engineering and resell it to legaspi. Legaspi could not pay for the plant in cash and Keith Engineering could not sell it on any other basis. Since Veronica by extending long-term credit to Legaspi was putting itself in the middle, and assuming all of the risk, it was justified in taking a substantial mark-up on the plant's resale. Respondent does not argue that such mark-up was unwarranted or excessive. When Legaspi finally received permission from Philippine authorities to operate in 1961, it began production of liquid cargo which was shipped by and sold through Veronica. At *33 that time Legaspi also began to make payments to Veronica on the copra plant. Until its liquidation, Veronica was at all times a bona fide entity, separate and apart from Jerome Brothers, Legaspi, Baker, and Keith Engineering. Not only has respondent failed to meet his burden, but we believe that petitioners have affirmatively established that Veronica acted as a principal (vendor) in the transaction involved herein and not merely as a conduit or nominee. Under these circumstances, there is no rule of law which permits respondent to shift the income from one entity to any other party so as to create a tax where none would otherwise be due. Therefore, we hold for petitioners on this issue. In view of the foregoing, the second issue is moot. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Varney V. Jerome and Iva Jerome, Docket No. 2875-63; and Paul Jerome and Angelina Jerome, Docket No. 2876-63.↩
2. A third issue raised in respondent's amended answers was conceded by respondent subsequent to the filing of his original brief herein.↩
3. Keith Engineering was in 1958, and still is, a partnership composed of Jack Keith and Frank, Paul, and Varney Jerome. Their respective percentages of participation are as follows: Percent
Jack Keith
50
Frank Jerome
16 2/3
Paul Jerome
16 2/3
Varney Jerome
16 2/3 Jack Keith was the managing partner of Keith Engineering and organized the company in 1953. He was an engineer by training. The Jerome brothers financed Keith Engineering and thereby acquired their ownership interests therein.↩
4. The agreement never set a minimum or maximum limitation on the copra plant's cost.↩
5. Accordingly, Legaspi was obligated to pay Veronica a total of $1,008,013 for the copra oil plant.↩
6. See p. 11, supra.↩
7. Veronica accepted such loans only after efforts to obtain additional funds from Philippine interests failed to materialize.↩
8. We also see no basis to conclude that Frank Jerome was acting primarily for Baker in the Veronica-Legaspi transaction as respondent asserts.↩
9. During the early stages of the copra oil plant venture it was believe that said plant would cost approximately between $175,000 and $200,000.↩